IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 DEC 17 AM 8:40

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOYCE H. JONES,                    )
                                   )
            Plaintiff,             )
                                   )
v.                                 )
                                   )   Case No. CV-98-TMP-3156-S
PROVIDENT LIFE AND ACCIDENT        )
INSURANCE COMPANY,                 )
                                   )
            Defendant.             )

**ENTERED** pc

**DEC 1 7 2001**

## MEMORANDUM OPINION

This cause is before the court on the defendant's motion for summary judgment filed November 15, 2000, contending that it is entitled to summary judgment in its favor on all of plaintiff's claims. Plaintiff filed a response to the motion on January 5, 2001, asserting that the motion should be denied because there exists a genuine issue of material fact as to whether the plaintiff was mentally competent to enter into the contract at issue in this action. A guardian *ad litem* was appointed for plaintiff, and the guardian *ad litem* filed an additional response, supported by evidence, on behalf of the plaintiff on September 24, 2001. The parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c); accordingly, the court enters this memorandum opinion.

## I.  FACTS

Plaintiff filed her complaint on December 18, 1998, alleging fraudulent suppression, fraudulent inducement, breach of fiduciary duty, intentional fraudulent misrepresentation, innocent misrepresentation, and seeking recission of a contract.  All of plaintiff's claims arise from a contract she entered into with the defendant in December 1996 through which she agreed to forego her monthly disability benefits and to accept a lump sum settlement. For purposes of determining whether defendant is entitled to summary judgment, the court views the following facts as undisputed:

The plaintiff, Joyce Jones, earned a bachelor's degree in accounting in 1966 from Auburn University.  She worked as an accountant and controller for several years.  She was employed by St. Francis Hospital in Miami, Florida, where she rose to the position of Executive Vice President, Chief Financial Officer.  In December 1989,  Jones became unable to work because of psychological and mental disorders.  Plaintiff has been diagnosed with bipolar disorder, severe depression, panic disorder and agoraphobia, and drug and alcohol abuse.  She was insured under two separate disability policies of the defendant, Provident Life and Accident Insurance Company ("Provident").  Provident deemed her "totally disabled."

After Jones became disabled, Provident began in 1990, pursuant to the policies, to pay Jones monthly disability benefits totaling $12,180 per month, payable until the insured reached the age of 65 or the disability ceased.  Jones was 48 years old when she became disabled.  Payments continued for about five years.  In order to receive the benefits on a monthly basis, Jones submitted verification from a doctor each month attesting that her disability continued.  There was never any dispute as to Jones' entitlement to, or the amount of, the benefits.[1]

From December 1992 until July 1998 Jones was treated by a psychiatrist at the University of Alabama at Birmingham, Dr. Janet Wright.[2]  According to Dr. Wright, Jones had been diagnosed with bipolar disorder, alcohol dependence, and agoraphobia prior to her first visit in 1992.  When she first saw Jones in 1992, Dr. Wright believed that she was no longer suffering from agoraphobia or alcohol dependence.  Jones' symptoms in 1992, Dr. Wright testified, were "some continued feelings of depression, low energy, lack of interest, and withdrawing."  Jones was taking Lithium to control

---

[1]     Even so, there is some discrepancy in the amount as set forth by the parties.  In their briefs, both defendant's counsel and the plaintiff's guardian *ad litem* state that the monthly total of payments from the two disability policies was $12,180.  However, the present value calculation submitted by the guardian *ad litem* is based on a monthly payment amount of $12,810.  (Plaintiff's evidentiary submissions, Ex. B at p.2)

[2]     The parties agree that Dr. Wright is qualified as an expert witness pursuant to Federal Rule of Evidence 702.

3

her bipolar disorder, which Dr. Wright continued to monitor, seeing Jones approximately twice a month.  On at least two occasions, Dr. Wright observed that Jones was either intoxicated from alcohol or had taken more of her medication than was prescribed.  Even so, Dr. Wright said she never had any reason to view Jones "any way but competent."

In 1994, Provident called Jones and offered her a lump sum settlement in lieu of monthly payments.  Jones said the Provident agent who called made it sound as if Jones would be "winning the lottery" by accepting a lump sum.  Jones discussed the matter with her husband and the manager of the Regions Bank in Columbiana, Alabama, where she had an account.  Both the bank manager and her husband told her that a lump sum settlement would not be to her benefit because it would have disadvantages related to taxes and to income level.  Jones' husband advised her not to settle unless Provident agreed to a "fair amount," which he suggested was about $1.8 million. Her husband calculated the amount after he consulted an attorney and a CPA in Miami, Florida.  The bank manager also told her that lump sum payments were "normally not good."  Jones declined the offer, and Provident did not contact her to solicit such an agreement again.

Approximately 18 months later, in January 1996, Jones initiated further discussion with Provident about a lump sum settlement.  Provident answered her telephone request with a

letter, asking her to forward a request in writing and to state the amount of settlement she would find appropriate. Provident further suggested that Jones discuss the matter with a "financial advisor." At the time she was considering settlement, Jones told Provident she had consulted a lawyer and a financial advisor. She also told Provident that she was relying upon advice from an investment banker.[3]

Jones wrote a letter dated February 19, 1996, informing Provident that she wanted to settle for a lump sum and that she would agree to $1,850,000. The amount set forth in her demand letter corresponds with the amount her husband had suggested was "fair." She further requested that Provident offer a "quick response" or a "serious counteroffer."

During the course of discussions with Provident over the next year, Jones occasionally talked with Dr. Wright about the potential settlement. Dr. Wright saw Jones twice during January 1996, the month when Jones inquired with Provident about a settlement. Dr. Wright at the time reported that Jones was "stable." Dr. Wright

---

[3]     Jones now claims that her statement was a lie told to make Provident take her seriously. However, Jones testified that over the course of her discussions with Provident she consulted an AmSouth investment sales representative, a Regions Bank manager, and her husband; and that her husband consulted an attorney and an accountant. Dr. Wright stated that even if Jones was lying when she told her that she received legal advice concerning the settlement, the fact that she lied would not change Dr. Wright's opinion on Jones' competency.

further testified that Jones told her in January 1996 that she might be getting ready to get a divorce.  Jones has testified that her husband told her before she filed for divorce that he would get half of her monthly disability payments.  On February 7, 1996, pursuant to Provident's inquiry, Dr. Wright signed a "statement of competency," attesting that Jones was "fully capable of understanding her business affairs and transactions, including the making of contracts... ."

Provident responded to Jones' letter of February 19, 1996, stating that it was willing to settle for $660,000.  Following phone conversations in March 1996, Provident told Jones that $660,000 was the "bottom line."  Provident continued to make monthly disability payments totaling $12,180 per month throughout 1996.  Jones alleges at some point in 1996 a Provident spokesman told her that her life expectancy was short due to her illness, that she was likely to commit suicide within a few years,[4] and that therefore she would be better off with the lump sum.  Dr. Wright testified that Jones never related that conversation to her, but that such an assessment of life expectancy was "ridiculous" and

---

[4]    Jones claims that a Provident claims manager for psychiatric claims, Jeffrey McCall, told her that she was likely to commit suicide and would not live long enough to collect more than the settlement amount.  Provident denies making any such statement. The court must assume, for purposes of the motion for summary judgment, that Jones' account is true.

that people with bipolar disorder who stay on their medication can be stabilized.

Jones called Provident near the end of March to ask if she would be receiving her March monthly payments, and was told she would.  Jones called again in April to inquire about the maximum amount Provident would pay as a lump sum settlement, and to ask if Provident would provide her with life insurance.  Provident responded at the same amount, $660,000, and declined to buy or sell her a life insurance policy.

Jones did not correspond with Provident again until September 1996, when she told the Provident claims representative she was going through a divorce, and asked to receive her September check early.  Provident agreed to mail the check as soon as the claim form arrived.  Throughout 1996, Jones asked Provident to expedite her monthly disability checks.  Provident did, and Jones wrote to thank the claims representative in October or November 1996, telling her: "Thanks so much for the efficiency in handling my claim. At the present I'm going through a rather difficult period, so your expediting my check is deeply appreciated."  During a session in October 1996, Dr. Wright noted that Jones was "having more depressive symptoms" related to her divorce, and had a low thyroid function test.

On or about November 21, 1996, Jones wrote another letter to Provident, stating:

I appreciate all you've done in providing my check.  At this particular time, I am in a real financial crisis due to legal and medical fees.  If you could process them quickly this month, I would be most grateful.  I realize this cannot be an ongoing situation, but I am in a desperate situation at this time.  Thank you.

On December 9, 1996, Jones called the Provident claims representative to inquire whether Provident would agree to a lump sum settlement of $800,000.  On or about December 10, 1996, Provident called Dr. Wright to inquire as to Jones's competency.  Dr. Wright expressed some concern over Jones' ability to spend the sum wisely.[5]  During the conversation between Dr. Wright and the Provident representative, the Provident representative noted that Jones had been deemed "borderline critical" in July 1996, and was suicidal on November 11, 1996.  Dr. Wright, however, did not opine that Jones was incompetent.  Provident suggested that Dr. Wright call Jones to discuss the "grave financial consequences" of the decision.  Immediately following the conversation with Provident, Dr. Wright called Jones and spoke with her on the telephone.  Jones told Dr. Wright that the decision to accept the settlement was related to her divorce and her husband "trying to get [her] money."

---

[5]     Apparently, Dr. Wright did not know the amount Jones settled her claims for, but had been told by Jones that the amount would be more than $1 million.

Dr. Wright then told Provident that it appeared Jones was acting under advice of counsel and was competent to handle her affairs.

Also early in December 1996, Jones consulted AmSouth Bank about potential investments, and was referred to Hugh Parrish, an investment sales representative.   She talked to him about her income at that time, about the potential settlement of $660,000, and about her plans to pay off a mortgage and invest the remainder of the sum.   He told her that the income she was getting in her monthly benefit checks was "far greater than the income she could receive" after investing funds from the lump sum settlement.   He further told her she could expect to receive an estimated $21,000 per year from the investments; far less than the approximate $150,000 per year she then received in monthly benefit payments. At the time she consulted Parrish, her account was overdrawn.   She told Parrish that she was getting a divorce and that her expenses would be reduced when she paid off her mortgage.   She also told Parrish that her husband was suing her for alimony.   She further indicated that she believed accepting the settlement would prevent her husband from receiving alimony, and that avoiding payment of alimony was the reason she was inclined to accept the $660,000 settlement.

9

On December 12, 1996, Jones called Provident to discuss the lump sum settlement.[6] On or about December 20, 1996, Jones called Provident and told them she would accept the offer of $660,000. Provident sent the settlement agreement to Jones that day and, pursuant to her request, called Hugh Parrish to let him know a check was forthcoming in settlement of Jones' policies. Jones signed the agreement on or about December 26, 1996, and returned it to Provident.

When asked at her deposition if Jones was competent to understand and appreciate her business affairs on December 26, 1996, Dr. Wright testified that she had "no reason to think she wasn't competent to do that." When asked if there was any time during the period in which Dr. Wright was treating Jones that she appeared unable "to appreciate and understand the nature and terms of her ordinary affairs," Dr. Wright stated that there was not. Indeed, Dr. Wright explained in a treatment note dated July 7, 1998, some eighteen months after the settlement, that Jones told Dr. Wright she was taking the lump sum settlement "to prevent her husband from getting any of the money." Dr. Wright wrote at that time:

---

[6]    The Provident agent made a note that Jones stated that an investment broker was "running the numbers" and that because of her divorce she needed to show a lower income. Jones denies making that statement, but does not deny that she had met with Hugh Parrish about the interest she might earn on the settlement, or that her husband was seeking alimony from her.

```
Pt. returns.  Is hear [sic] because she would like for me
to tell a lawyer that she was incompetent at the time of
her divorce to make financial decisions.
     I do not agree with this as I did discuss this with
Ms. Atwater [plaintiff] at the time.  She had full
understanding of what she was doing.  She told me she was
taking a lump sum settlement on her disability insurance.
She said she was doing this to prevent her husband from
getting any of the money.  She said she would get 1.2
million and that if she invested this her earnings would
be close to what she currently received.  This was well
thought out & logical.
     As it turns out the settlement was far less, but
Ms. Atwater agreed anyway.  I cannot explain her actions
on that day as I did not see her, but doubt she had
become incompetent in a few days.
```

Plaintiff filed the complaint commencing this action on
December 18, 1998, alleging that Provident fraudulently suppressed
the fact that the lump-sum payment was less than would be available
to her if she continued to receive her monthly benefits, and
fraudulently misrepresented that the lump-sum payment was equal to
or in excess of the amount she would receive if she continued to be
paid monthly.  Plaintiff also alleges that Provident fraudulently
induced her to accept the lump-sum payment by taking advantage of
her debilitating illness and by misrepresenting the life expectancy
of persons afflicted with the same illness.  Plaintiff further
claims that Provident breached a fiduciary duty it owed to her, and
seeks to rescind the 1996 contract that released Provident from its
obligation to pay monthly benefits.

11

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own

12

affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

14

## III.  DISCUSSION

### A.  Competence Of Plaintiff

Underlying all of plaintiff's arguments in opposition to defendant's motion for summary judgment is the issue of Jones' mental competence to enter into the lump sum settlement agreement with Provident in December 1996.  Plaintiff's guardian *ad litem* asserts in the response to defendant's motion that Provident "took advantage of a sick and confused woman."  In sum, plaintiff asserts that because of her weakened mental condition, the defendant was not competent to enter into the settlement contract.  Plaintiff further asserts that because she was in a weakened mental state, Provident had a duty to disclose to her the details concerning the present value of the disability payments and that she relied upon Provident's false representation as to the plaintiff's life expectancy.  Accordingly, although neither the motion for summary judgment nor the plaintiff's responses seek a declaration as to plaintiff's competence on December 26, 1996, the court must make an assessment of her competence in order to properly evaluate the instant claims for recission, fraud, and outrage.

It is undisputed that Jones was disabled due to bipolar disorder and depression.  It also is undisputed that she was college-educated in the field of accounting and earned her living in the field of finance for many years.  Accordingly, a relatively

15

simple business decision, such as whether to accept payment over time or to demand a lower sum at present, was well within her realm of expertise, unless she was so mentally disabled that she could not make a rational decision.  Plaintiff was not uneducated or unsophisticated in the area of finance.

The defendant has demonstrated that the psychiatrist who treated Jones for approximately seven years, and who was treating her in December 1996, has declared that, in her expert opinion, Jones was competent to enter into the settlement agreement with Provident in December 1996.  The same psychiatrist talked to Jones on the day Jones verbally agreed to the settlement; she told Provident on that day that Jones was competent.  Furthermore, in spite of observing that plaintiff suffered depression and had at times appeared intoxicated, Dr. Wright assessed Jones as competent to handle her own affairs at all times during her treatment from 1992 through 1998.  That psychiatrist-patient relationship apparently ended in 1998 when Dr. Wright refused plaintiff's request to opine that she was incompetent to make financial decisions in 1996.

Plaintiff simply has not offered any evidence to contradict Dr. Wright's assessment, or otherwise to create a genuine issue of fact concerning her competence to understand and make financial decisions in 1996.  Instead, plaintiff offers the bare argument that the settlement was such a bad deal for plaintiff economically

16

that she must have been incompetent or she would not have accepted it.[7]  Plaintiff has not offered the testimony of any other doctor,

---

[7] The court is not convinced that the decision to accept a $660,000.00 lump-sum settlement was financially unwise or so disadvantageous to plaintiff as to raise any evidentiary concern about her competence.  By the time she reached the settlement with Provident in late December 1996, plaintiff was 54 or 55 years old (she was 48 years old in late 1989, when she became disabled). Because the disability coverage would be paid only until she reached age 65, she had only about 10 years of coverage remaining. At $12,180.00 per month, plaintiff was receiving $146,160.00 per year in disability payments, and it was not increasing or being adjusted for inflation.  Thus, with about ten years remaining in disability payments, plaintiff could have expected to receive about $1,461,600.00 in additional disability payments had she not entered into the settlement.  If plaintiff had invested the $660,000.00 lump sum, her total earnings over the same ten-year period would have approximately matched the same gross pay-out she would have received in monthly payments.  For example, if she had invested $660,000.00 at 8 percent per year (not an unlikely possibility in the boom stock market of the late 1990s--between 1994 and 1999, the Standard & Poors 500 Stock Index advanced at an average rate of about 24% a year), compounded monthly, her total investment value at the end of ten years would have been $1,464,962.55, slightly more than the gross pay-out in monthly disability payments.  If invested at 10% per year (a little less likely, but not impossible), her total investment would be worth $1,786,647.38, a substantial improvement over the monthly payments.

There were, of course, sound financial reasons *not* to accept the lump sum.  The rate of investment of the lump sum was in no way guaranteed (as many investors have learned since 1999), and the earnings from the investment would be fully taxable, unlike the monthly disability payments.  Further, plaintiff could have invested a portion of the monthly payments to generate additional income over the same ten year period over and above simply matching the gross pay-out.  The point, however, remains that the decision to take a lump sum for immediate investment was not irrational, given the way the stock market was performing in 1996.  Plaintiff may well have suffered from the same greed that infected many investors in the 1990s, and could have rationally concluded that she could make more money investing on the stock market than waiting patiently for each month's disability payment.  The fact that she did not invest the money after she received it does not reduce the financial rationality of the decision to invest.

17

or even any family member, friend, or business associate, to contradict Dr. Wright's testimony. While the court is hesitant to opine that there could never be a situation in which a contract is so one-sided or unfair that the court could conclude from that fact alone that the disadvantaged party was incompetent, the case at bar is certainly not that situation.

In the instant case, Jones was extremely knowledgeable about financial matters. She consulted her husband about the possibility of a lump sum settlement in 1994. He consulted a banker and an attorney, and she had knowledge of what he learned. She admits that "everyone" advised her against accepting the settlement. In 1996, about the time she was entering into divorce proceedings, the plaintiff initiated contact with Provident about a potential settlement agreement. She proposed an amount for the settlement, and acknowledged that it was subject to negotiation when she requested a "serious counteroffer." She told Dr. Wright that she wanted to take a lump sum settlement - not because it was financially advantageous to her in the long run - but because she believed it would prevent her husband from getting half of her disability payments after they divorced. She met with a bank representative about investing the proceeds. She discussed with him her financial situation, her anticipated expenses, and her mortgage.

18

In light of the defendant's evidence, and taking into consideration the whole of Jones's and Dr. Wright's depositions, the court cannot find that there is a genuine issue of fact concerning whether plaintiff was incompetent to enter into the contract at the time she signed the agreement in December 1996. She may have made a bad deal, and she may have felt pressured by financial concerns and illness; however, the same is true of many persons who must make decisions about insurance or income. Accordingly, the court concludes that there is no substantial evidence to find that the plaintiff was incompetent to enter into the agreement with Provident at issue in this case and, thus, cannot avoid summary judgment on that basis.

### B.  Fraudulent Suppression

Under Alabama law, a claim of fraudulent suppression requires plaintiff to show that the defendant suppressed a material fact, having had a duty to communicate that fact, and that the injury resulted from the suppression. Doss v. Serra Chevrolet Inc., 781 So. 2d 973 (Ala. Civ. App. 2000).  For the court to determine whether a duty to disclose exists in any particular instance, Alabama law requires an assessment of a number of factors, including: (1) the relationship between the parties; (2) the relative knowledge of the parties; (3) the value of the particular

19

fact; (4) the customs of the trade; and (5) other relevant circumstances. <u>Cunningham</u>, 74 F. Supp. 2d at 1163.  In instances where the parties deal at arm's length, with no confidential relationship, no duty to disclose arises unless there has been a request for information.  <u>Miller v. Pawn World, Inc.</u>, 705 So. 2d 467 (Ala. Civ. App. 1997).  Furthermore, the relationship of insurer and insured is not "equivalent to the confidential relationship envisioned by the Alabama courts" that would give rise to a duty to disclose.  <u>Clay v. Equifax Inc.</u>, 762 F.2d 952, 961 (11th Cir. 1985)(applying Alabama law to determine if failure of insurers to disclose to insured allegedly libelous matter in credit reports amounted to fraudulent concealment).  Finally, the concealed fact is "material" only if knowledge of the fact would have induced plaintiff to act.  <u>See, e.g.</u>, <u>Bank of Red Bay v. King</u>, 482 So. 2d 274 (Ala. 1985).  Accordingly, plaintiff's suppression claim can survive summary judgment only if her illness created "special circumstances" that gave rise to a duty to disclose, and only if suppression of the fact at issue was "material" and plaintiff would have rejected the offer if Provident had disclosed the difference in the amount of the lump sum and the value of her continued monthly payments (or the present value of the projected payments).

Plaintiff has failed to demonstrate that her mental illness constituted a "special circumstance" such that Provident had a duty

to disclose to her that the $660,000 was less than the value of the payments made over time.  To the contrary, although Jones suffered from mental illness severe enough to prevent her from working, all other evidence indicates that Jones was capable of doing the relatively simple math required to calculate the present value of her payments.  Furthermore, even if Jones was unable to calculate the figure, it is clear that Jones received capable financial advice,[8] and that she informed Provident that she was seeking such outside advice.[9]  Moreover, plaintiff does not seriously contest that she knew that the lump sum was less than the amount she would receive if she continued to receive payment on a monthly basis. She not only was capable of understanding that fact on her own, according to her psychiatrist, but she also was told that fact by her husband and by two bankers.  The facts suggest that Jones accepted the lump sum not because of its long-term value, but because she believed it met her short-term goal of defeating her

---

[8]    While plaintiff asserts that Parrish was not an "advisor," it is nevertheless undisputed that he informed plaintiff that the amount of income to be generated from the lump sum would be far, far less than the amount she would receive per month if she chose not to settle.

[9]    Provident's knowledge or belief that plaintiff had accurate information regarding the value of the lump sum payment clearly diminished any duty to disclose that fact.  This is especially true where Provident both suggested that plaintiff get financial advice upon her request for a lump sum settlement, and asked plaintiff's psychiatrist to ascertain whether the plaintiff understood the financial consequences of the settlement.

husband's attempt to be awarded alimony.  These facts work together to demonstrate both that Provident had no duty to disclose the fact at issue to the plaintiff, and that the value of the settlement was not "material" to plaintiff and suppression of that fact did not induce her to accept the settlement.  Accordingly, the defendant is entitled to summary judgment in its favor on any fraudulent suppression claim.

### C.  Fraudulent Misrepresentation

To support a claim of fraudulent misrepresentation, the plaintiff must demonstrate that the defendant made "(1) a false representation, (2) of an existing material fact, (3) that was reasonably relied upon, and (4) damage resulting as a proximate cause." Wheelan v. Sessions, 50 F. Supp. 2d 1168, 1172 (M.D. Ala. 1999).  Generally, a claim of fraud cannot be based upon the defendant's expression of an opinion or a prediction of future events. See, e.g., Wade v. Chase Manhattan Mortgage Corp., 994 F. Supp. 1369, (N.D. Ala. 1997) aff'd, 132 F.3d 1461 (11th Cir. 1997). Such opinions or predictions simply are not statements of existing fact upon which individuals have the right to rely.  Crowne Investments, Inc. v. Bryant, 638 So. 2d 873 (Ala. 1994), citing Ala. Code § 6-5-101.  Statements regarding value are considered to be opinions, and not facts, for purposes of Alabama's fraud

22

statutes.  Kaye v. Pawnee Const. Co, 680 F.2d 1360 (11th Cir. 1982).
The standard of reliance now required under Alabama law is deemed
"reasonable reliance."  See Foremost Ins. Co. v. Parham, 693 So. 2d
409, 423 (Ala. 1997)(adopting reasonable reliance standard and
rejecting the justifiable reliance standard set forth in prior
cases).   Under the applicable standard, the reliance must be
"reasonable under the circumstances."  Wheelan, 50 F. Supp. 2d at
1173.

     In this case, Jones alleges that Provident misrepresented two
facts: her life expectancy, and the true value of the lump sum.
The alleged statement that Jones would not live long because of her
illness, and that she would commit suicide in the near future was
not a statement of existing fact, but rather a prediction of future
events or an opinion.  Similarly, the statement regarding value is
a statement of opinion.  Accordingly, the statements cannot give
rise to a claim of fraud under Alabama law.

     The statements made the basis of plaintiff's fraud claims also
are not actionable because there is no evidence that the plaintiff
reasonably relied upon the statements or that they induced her to
accept the lump sum.  In fact, there is no evidence that plaintiff
would have rejected the offer if she had known her true life
expectancy or if she had known the true present value of the
disability payments.  To the contrary, the evidence demonstrates
that the plaintiff had knowledge that the statement regarding life

expectancy was false, and that she accepted the offer for other reasons. Similarly, there is ample evidence that Jones knew the lump sum was less than she would receive over time, and was less than the present value of the expected payments, but that she accepted the offer in spite of the obvious financial folly in doing so.[10] Accordingly, the defendant's motion for summary judgment on Jones' claims for active fraud is due to be granted.

### D. Breach of Fiduciary Duty

Plaintiff has claimed that Provident breached a fiduciary duty it had to her by failing to disclose that the amount of the lump sum settlement was far less than the value of the monthly payments she would likely receive over time. Assuming, without deciding, that such a fiduciary duty existed in this case, the court cannot find that the duty was breached. For all the reasons set forth in the court's examination of the fraud and suppression claims, The difference between the monthly payments and the lump sum were fully explained to and well understood by plaintiff. The motion for summary judgment as to the fiduciary duty claim is due to be granted.

---

[10] Again, for the reasons expressed in footnote 7, above, the decision may not have been so foolish as it now appears in hindsight.

24

### E.  Recission

Plaintiff's only ground for recission of the contract at issue is that she was incompetent to enter into the contract at the time she agreed to the lump sum settlement.  For all the reasons set forth in the discussion of plaintiff's competence, *supra*, the court finds the defendant's motion for summary judgment on the recission claim is due to be granted.  There is simply no substantial evidence to create a genuine issue of fact about whether plaintiff was incompetent to understand the consequences of the financial decisions she made in 1996.

### F.  Outrage

The plaintiff states a claim based on Alabama law for the tort of outrage.  The tort was first recognized by the Alabama courts in American Road Service Company v. Inmon, 394 So. 2d 361 (Ala. 1980).  Since then, the Alabama Supreme Court has repeatedly made clear that a remedy is reserved for only the most egregious conduct, conduct that is both "extreme" and "outrageous" and that goes "beyond all possible bounds of decency" so as to be "atrocious and utterly intolerable in a civilized society." See, e.g., Jackson v. Alabama Power Co., 630 So. 2d 439, 440 (Ala. 1993); Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1044 (Ala. 1993).  As discussed in relation to plaintiff's other claims, defendant's

conduct in this case is not "extreme" or "outrageous" as would support a claim of outrage.

Plaintiff's outrage claim fails to survive the defendants' motion for summary judgment for a second reason.  Not only must the conduct that prompts an outrage claim be deemed egregious, the emotional distress that results also must be so extreme that "no reasonable person could be expected to endure it."  Potts v. Hayes, 771 So.2d 462 (Ala. 2000).  Plaintiff complains that she has filed for bankruptcy and has been unable to pay her bills because of the settlement; however, her distress is not the kind of "extreme emotional distress" required to sustain an outrage claim. Consequently, the defendant's motion for summary judgment on Jones' outrage claim is due to be granted.[11]

### IV.  CONCLUSION

Based on the foregoing considerations, the court finds that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law.  Consequently, the motion for summary judgment filed by the defendant (court document #40) is due to be granted and the plaintiff's claims are due to be

---

[11]    Defendant seeks dismissal of the claim for the tort of outrage based on a contention that it is barred by the statute of limitations.  The court finds that the claim relates back pursuant to Federal Rule of Civil Procedure 15(c), and therefore is not time-barred.

dismissed with prejudice.  A separate order will be entered in accordance with this opinion.

The Clerk is DIRECTED to serve a copy of this memorandum opinion upon all counsel of record.

DONE the ___17th___ day of December, 2001.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

27